Gary A. Gotto, Bar No. 007401
Keller Rohrback L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822
ggotto@kellerrohrback.com

*Attorneys for Plaintiff and the Proposed Class*

[Additional counsel on signature page]

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Craig Hannum, individually and as a representative of a class of participants and beneficiaries on behalf of the Banner Health Master Health and Welfare Plan, <br><br> Plaintiff, <br><br> vs. <br><br> Banner Health; Lockton Companies, LLC; and BCInsourcing LLC, <br><br> Defendants. | **No.** <br><br> **CLASS ACTION COMPLAINT** |

Plaintiff Craig Hannum, by his undersigned attorneys, on behalf of the Banner Health Master Health and Welfare Plan, and similarly situated participants in the Plan and their beneficiaries, allege upon personal knowledge, the investigation of his counsel, and upon information and belief as to all other matters, as to which allegations he believes substantial evidentiary support will exist after a reasonable opportunity for further investigation and discovery, as follows:

1

KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

**NATURE OF THE ACTION**

1. Voluntary benefits insurance includes supplemental health insurance products—accident insurance, critical illness insurance, and hospital indemnity insurance—offered by employers, here Banner Health via the Banner Health Master Health & Welfare Plan (the "Plan"). The employer, working with its insurance broker, here Lockton Companies, LLC ("Lockton"), selects the supplemental health insurance carrier, here Aetna Life Insurance Company, and agrees to the terms of coverage, including the premiums. Participants in the Plan fund the supplemental health insurance from their own wages. Supplemental health insurance is one of the most commoditized products in the insurance industry. The underlying coverage structures—accident benefit triggers, critical illness conditions covered, hospital indemnity daily payment amounts—are substantially similar across carriers, as detailed below. Because the products are largely interchangeable, the main differences between one voluntary benefits arrangement and another are not the quality and scope of coverage, but the amount of premiums paid by plan participants. And the difference in premiums is driven largely by commissions paid to the broker.

2. In the voluntary benefits market, carriers, like Aetna here, do not set premium rates independently and then separately negotiate broker compensation. The process works in reverse: the broker, Lockton here, specifies the commission structure it wants—whether a "heaped" commission (a high first-year payout followed by lower renewal rates) or a "level" commission (a consistent percentage paid every year)—and the carrier bundles that commission into the premium rate. The broker also sets the

benefits administration ("ben admin") fee, an additional cost that compensates enrollment firms for technology platforms and enrollment support services. The carrier likewise bakes that fee into the rate structure that participants pay. The carrier prices the product to achieve its target profitability after accounting for the broker's commission demand, the ben admin reimbursement, its own administrative costs, and its profit margin. Thus, the participant's premium payments are a direct function of the broker's compensation demands. When the broker demands more, the carrier charges more, and participants pay more.

3.      This arrangement produced extraordinary results for Lockton and BCInsourcing, LLC ("BCI"), but conferred no value on participants. In 2019, commission rates on the Aetna voluntary benefits lines of coverage were 13.2 percent. In 2020, when BCI entered as co-broker, commissions spiked to 67.6 percent—more than five times the prior year—and, for the reasons explained above, premiums spiked in virtual lock-step. This was not an accident. This is the hallmark of a "heaped" commission arrangement, in which the broker extracts the maximum possible first-year payout, knowing the cost will be embedded in the rates participants pay for years to come. Two-thirds of every premium dollar went to brokers that year. The commission rate never fell below 25.5 percent in any subsequent year. Premiums more than tripled over the class period, increasing from $4.4 million to $15 million, yet commission rates remained elevated, because the brokers' compensation was not calibrated to the scope or complexity of their services—it was calibrated to the volume of premiums flowing through the arrangement.

KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

4.      The loss ratio tells the story of what participants received in return. The loss ratio—the percentage of premiums returned to participants as claims—is the single most direct measure of value in insurance. Unlike the "combined ratio" used to measure carrier profitability (which includes carrier expenses and profit margins alongside claims), the loss ratio isolates the question that matters most to the people paying premiums: of every dollar I pay, how much comes back to me as a benefit? After deducting the 33.5 percent average commission paid to Lockton and BCI, the effective loss ratio available to participants was driven well below the regulatory floors that state and federal authorities have established for insurance products. For context, the Affordable Care Act mandates a minimum 85 percent medical loss ratio for large employer-sponsored health plans. State regulators impose minimum loss ratios of 50 to 60 percent for hospital indemnity insurance and 60 to 70 percent for specified disease policies. *See*, *e.g.*, N.Y. Comp. Codes R. & Regs. tit. 11, § 52.45. An arrangement that diverts one-third of every premium dollar to broker commissions before the carrier takes its own expenses and profit makes it arithmetically impossible to deliver loss ratios that meet even the most permissive of these regulatory benchmarks. Banner Health's participants paid far more for far less value for their premium dollars than any regulatory standard contemplates.

5.      Plaintiff Craig Hannum was an Operations Consultant at Banner Health's Arizona campus. He began working at Banner Health in September 2020. When Banner Health's annual open-enrollment period arrived each fall, he did what his employer told him to do: he logged into Banner Health's benefits portal, reviewed the supplemental health plans page—the one bearing the Banner Health logo, grouped right alongside

medical, dental, and vision coverage—and clicked "ENROLL NOW" for supplemental health insurance. He wanted a safety net in case something happened to him or his family. Between September 2020 and May 2023, Banner Health deducted from his paychecks for that coverage. What Plaintiff Craig Hannum did not know—what Banner Health never told him—is that for every dollar taken from his paycheck, approximately thirty-four cents went to broker commissions. He did not want to pay thirty-four cents of every dollar for brokerage services. He wanted insurance at a reasonable price. He was injured because he paid for brokerage commissions that did not benefit him in any way. He could have purchased essentially the same level of insurance coverage at a much lower cost without exorbitant brokerage commissions. Banner Health knew or should have known that the brokerage commissions were exorbitant and that equivalent insurance coverage was widely available at a much lower cost. He paid for first class but was seated at the back of the plane.

6.      Plaintiff Craig Hannum's experience was not unique. Between 2019 and 2024, employees of Banner Health paid approximately $62 million in premiums for voluntary benefits insurance—accident, critical illness, and hospital indemnity coverage—through the Plan. Approximately one-third of all premiums paid by employees went to broker commissions—approximately $20.8 million over six years. These were not commissions paid on top of premiums. They were baked directly into the premium rates that Banner Health's employees paid from their wages. Aetna set its premium rates to account for the commission percentage that Lockton demanded—directly in connection with the placement of the insurance at Banner Health. A higher

KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

commission meant a higher premium. A lower commission—or no commission at all, as comparably situated employer plans demonstrate is feasible for these identical products— meant a lower premium. Every dollar paid to Lockton was a dollar taken from employee paychecks.

7. Banner Health, as the Plan's fiduciary, had a duty under the Employee Retirement Income Security Act of 1974 ("ERISA") to select a prudent supplemental health insurance policy for its employees. This duty required Banner Health to ensure that participants paid a reasonable premium for insurance services and that the insurance value was reasonable in light of the price paid. Banner Health was also required to determine whether the brokerage commissions paid were reasonable compensation for services provided. The premiums paid by participants were objectively unreasonable; the insurance coverage provided to participants was objectively unreasonable; and the commissions paid to brokers were simply outlandish.

8. A prudent fiduciary would not have chosen the supplemental health insurances Banner Health offered to its employees at the premium levels paid by participants. A prudent fiduciary would have questioned and rejected the commission structure. A prudent fiduciary would have probed whether the broker's commission was reasonable for the services it provided. A prudent fiduciary would have compared the Aetna commission arrangement to readily available market benchmarks showing that comparable plans pay commissions of 10 percent or less for identical products. Banner did none of these things.

9. Plaintiff brings this action under ERISA §§ 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3), on behalf of the Plan and a class of Plan participants and beneficiaries. Plaintiff alleges that Banner Health breached its fiduciary duties of prudence and loyalty under ERISA § 404(a), 29 U.S.C. § 1104(a), by selecting and maintaining a supplemental health insurance program that caused the Plan and participants to pay unreasonably high premiums for the level of coverage provided and for causing the Plan and participants to pay grossly unreasonable broker commissions. Banner Health must restore all losses suffered by the Plan and pay Plaintiff equitable restitution.

10. Plaintiff further alleges that the supplemental insurance and commission arrangements constituted a series of prohibited transactions under ERISA §§ 406(a), 29 U.S.C. §§ 1106(a), because Lockton, BCI, and Aetna were parties in interest who furnished services to the Plan and Lockton received objectively excessive compensation, directly or indirectly, in connection therewith.

11. Plaintiff further alleges that Lockton knowingly participated in Banner Health's breaches of fiduciary duty and in the prohibited transactions, and seek disgorgement of all excessive compensation received by Lockton pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

12. Plaintiff further alleges that BCI knowingly participated in Banner Health's breaches of fiduciary duty and in the prohibited transactions, and seek disgorgement of all excessive compensation received by BCI and seek disgorgement of all excessive

KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

compensation received by Lockton pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

<strong>JURISDICTION AND VENUE</strong>

13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), which provides for exclusive federal jurisdiction over actions brought under ERISA § 502(a).

14.    This Court has personal jurisdiction over Defendant Banner Health because Banner Health is headquartered in Phoenix, Arizona, within this District, and the Plan is administered in this District.

15.    This Court has personal jurisdiction over Defendants Lockton because it transacted business within this District in connection with the Plan, provided services to the Plan within this District, and received commissions, directly or indirectly, from Plan assets.

16.    This Court has personal jurisdiction over Defendant BCI because it transacted business within this District in connection with the Plan, provided services to the Plan within this District, and received commissions, directly or indirectly, from Plan assets.

17.    Venue is proper in this District under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, some or all of the fiduciary breaches took place in this District, and at least one Defendant resides or may be found in this District.

KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

18.     Venue is also proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this District.

## PARTIES

### A.     Plaintiff Craig Hannum

19.     Plaintiff Craig Hannum is a resident of the State of Washington. Plaintiff Craig Hannum was employed by Banner Health as an Operations Consultant from September 2020 to May 2023. Plaintiff Craig Hannum enrolled in the Plan's accident insurance, critical illness insurance, and hospital indemnity insurance from 2020 through 2022. During this period, Plaintiff Craig Hannum paid approximately $47.45 in premiums for these coverages. Plaintiff Craig Hannum enrolled because Banner Health's benefits materials—bearing the Banner Health logo and integrated into the same enrollment portal as medical and dental coverage—presented these products as part of Banner Health's official benefits package. Plaintiff Craig Hannum trusted that his employer, as a fiduciary, had ensured that the premiums deducted from his paycheck reflected the reasonable cost of insurance—not a vehicle for enriching brokers. A substantial portion of Plaintiff Craig Hannum's premiums were paid to Lockton as commissions embedded in the premium rates. Plaintiff suffered injury for the reasons explained above.

### B.     Defendant Banner Health

20.     Defendant Banner Health is a national healthcare system with its principal place of business in Phoenix, Arizona. Banner Health employs approximately 48,000

9

KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

individuals across the United States and operates healthcare facilities in numerous states. Banner Health's Employee Identification Number ("EIN") is 45-0233470.

21.     Banner Health is the sponsor of the Banner Health Master Health and Welfare Plan (Plan #501) (the "Plan"), within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B), and the administrator of the Plan within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A). The Plan became effective on January 1, 2001.

22.     Banner Health is a named fiduciary of the Plan within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a) because it is the Plan administrator. Banner Health is also a functional fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary, authority and control over the management and administration of the Plan, including by selecting and retaining Lockton as the Plan's primary broker, selecting BCI as co-broker, selecting Aetna Life Insurance Company as the carrier, establishing the voluntary benefits program, integrating it into Banner Health's employee benefits infrastructure, promoting it during annual open enrollment, facilitating payroll deduction of premiums, and providing employee data to Lockton, BCI, and Aetna to enable enrollment.

23.     As an ERISA fiduciary, Banner Health was required to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Banner Health was further required to act "solely in the interest of the participants and beneficiaries" of the Plan and "for the exclusive purpose of providing benefits to

KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

participants and their beneficiaries" and "defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).

24.    ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), requires a fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." This is an objective standard measured against the conduct of a hypothetical prudent expert, not a lay person.

25.    The duty of prudence encompasses both process and outcome. A fiduciary must employ a prudent process for evaluating products, fees and service-provider compensation.

26.    The duty of prudence is ongoing. A plan fiduciary must review all service-provider arrangements and Plan contracts at regular intervals to ensure they remain prudent and that service-provider compensation is reasonable.

27.    A prudent process for evaluating broker compensation includes at minimum: (a) benchmarking broker compensation against market rates for comparable services; (b) periodic competitive bidding or solicitation of alternative proposals; (c) evaluation of the scope and quality of services provided relative to fees charged; (d) monitoring whether fees remain reasonable as plan assets and participant populations change; and (e) careful consideration of any independent evidence that fees may be excessive.

**C.      Defendant Lockton Companies, LLC**

28.      Defendant Lockton is a national benefits brokerage and consulting firm with numerous offices throughout the United States. Lockton is one of the largest privately held insurance brokerages in the world. Lockton has served as the Plan's primary broker for voluntary benefits insurance since at least 2019. Banner Health selected Lockton to serve as broker.

29.      Lockton is a party in interest to the Plan within the meaning of ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B), because it provides services to and for the benefit of the Plan, namely advising on the selection and monitoring of supplemental health insurance, disability insurance, and other products. From 2019 through 2024, Lockton received approximately $11.3 million in commissions from Plan assets in connection with the Plan's contract with Aetna.

**D.      Defendant BCInsourcing**

30.      Defendant BCI is a benefits administration and enrollment services entity. It began receiving commissions as a co-broker under the Plan's voluntary benefits contract in 2020.

31.      BCI is a party in interest to the Plan within the meaning of ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B), because it provides services to the Plan. From 2020 through 2024, BCI received approximately $9.5 million in commissions from Plan assets for the Aetna voluntary benefits line. Notably, in 2020—BCI's first year of involvement—the commission rate spiked from 13.2 percent to 67.6 percent, with

KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

commissions increasing more than sevenfold even as the total premiums increased by only 44 percent.

32.    BCI participated in structuring and administering the enrollment process, received participant personal data to facilitate enrollment, provided benefit administration services, and received compensation directly, or indirectly, from Plan assets through the commission arrangement.

**E.    Non-Party: Aetna Life Insurance Company**

33.    Aetna Life Insurance Company ("Aetna" or the "Carrier") is the insurance carrier that issued the voluntary benefits policies under the Plan from 2019 to the present, covering accident, critical illness, and hospital indemnity products. Aetna is a party in interest to the Plan within the meaning of ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B), because it provides services to the Plan. Aetna received premiums from Plan participants through payroll deductions processed by Banner Health. Aetna paid commissions to Lockton and BCI from those premiums. Aetna set its premium rates to incorporate the commissions demanded by Lockton, such that participants' premiums directly reflected the cost of broker compensation.

**F.    Non-Party: Banner Health Master Health and Welfare Plan**

34.    The supplemental health insurance program is part of an ERISA plan. Each year, under penalty of perjury, Banner Health files a form 5500 for the Plan. Banner Health says: (1) the Plan is a single-employer plan (Part I.A); it is the Plan's sponsor (Part II.2a); each year an executive at Banner Health signs the Form 5500 on behalf of the Company in its capacity as Plan administrator; the 2024 5500 identified the

13

KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

approximate number of Plan participants covered under the Aetna policy as 52,751; the supplemental health insurance program is part of the Plan where it is included in the Form 5500 and shares the same three-digit plan number as Banner Health's other welfare plans.

35.    The supplemental health insurance program was selected by Banner Health, the employer of the participants in the Plan. Lockton, the broker, was selected by Banner Health to advise it on behalf of the Plan in selecting the carrier. Banner Health also selected BCI. Banner Health offers supplemental health insurance through its human resources department as part of a suite of benefits available to its employees.

36.    Banner Health selected Lockton as the broker for the voluntary benefits program. Banner Health selected, or authorized Lockton to select, Aetna as the carrier. Banner Health adopted the terms of the insurance arrangement. Banner Health integrated the voluntary benefits products into its broader employee benefits platform, presenting them to employees alongside employer-sponsored medical, dental, and vision coverage in a unified benefits package through a unified enrollment portal.

37.    Employees enroll in these products during Banner Health's annual open-enrollment period through Banner Health's benefits portal. Employees' election forms are processed through Banner Health's human resources systems. Premium payments are deducted directly from employees' paychecks by Banner Health's payroll department and remitted to Aetna. This infrastructure—the benefits platform, the enrollment processes, the payroll systems, the employee communications—is Banner Health's.

38.    Banner Health promoted the voluntary benefits products during its annual open-enrollment period through company-wide communications, benefits fairs, and enrollment materials distributed to employees. Banner Health provided employee census data, including personal identifying information, job classifications, and salary information, to Lockton, BCI, and Aetna to facilitate enrollment and underwriting. Banner Health maintained the payroll systems and human resources information systems that constituted the administrative infrastructure of the program.

39.    Banner Health's 2024 Benefit Guide explicitly references the voluntary benefits products and displays the Banner Health logo on the supplemental health plans page. The Guide presents these products to employees as part of Banner Health's official benefits offerings, integrated alongside employer-sponsored medical, dental, and vision insurance. The Guide includes "ASK ALEX" and "ENROLL NOW" buttons that integrate directly into Banner Health's enrollment system. Banner Health deployed ALEX, an AI-powered benefits counseling tool, to present voluntary benefits products to employees as recommended options within Banner Health's benefits portal, further embedding the voluntary benefits program into the official employer benefits infrastructure and further establishing Banner Health's active role in promoting and facilitating the program.

40.    The same 2024 Benefit Guide includes a page describing pet insurance that contains an explicit ERISA disclaimer: "Participation in this plan is voluntary and not subject to ERISA." Banner Health made no such disclaimer on the voluntary benefits program of the Guide.

KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

15

## DEFENDANTS CAUSED THE PLAN AND PARTICIPANTS TO PAY FAR MORE FOR SUPPLEMENTAL HEALTH INSURANCE THAN THEY SHOULD HAVE

### A.    Participant-Paid Premiums Are Plan Assets

41.    Participant premium contributions to voluntary benefits insurance are plan assets. Employee contributions to an ERISA-covered plan become plan assets as of the earliest date on which such contributions can reasonably be segregated from the employer's general assets. Here, Banner Health deducted premiums from employees' paychecks and remitted them to Aetna—a process that identifies and segregates employee contributions at the moment of deduction. Commission payments from those premiums to brokers are direct or indirect transfers of plan assets because the amount of the premium payment is directly correlated to the commission commanded by Lockton. The commissions are payments funded by participant premiums—money deducted from employees' paychecks—that flow through the carrier and are distributed to brokers. The carrier is a conduit, not the source. The source is the participant's paycheck.

### B.    Loss Ratios Show Participants Overpaid for Coverage

42.    The loss ratio is the most important metric for evaluating whether participants overpaid for insurance coverage because it goes directly to value received for price paid. The loss ratio measures the percentage of premiums that the insurance carrier pays out in claims to participants. It directly answers the question that matters most to participants: how much coverage am I getting for every dollar in premiums?

43.    The loss ratio is superior to other insurance metrics for this purpose. The "combined ratio"—which includes the carrier's operating expenses and profit margin

KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

16

KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

alongside claims—measures the carrier's profitability, not whether the insured overpaid. A carrier can have a combined ratio of 95 percent (barely profitable) while paying out only 30 percent of premiums in claims. The difference is consumed by commissions, administrative costs, and overhead. The loss ratio strips away the carrier's expenses and isolates the relationship between what participants pay and the value of the product.

44.     For voluntary benefits products, the loss ratio has an additional virtue: it captures the impact of excessive broker commissions. Every dollar diverted to commissions is a dollar that cannot be returned to participants as benefits. A plan with a 33.5 percent commission load starts with a maximum possible loss ratio of 66.5 percent—before the carrier takes its administrative expenses, taxes, and profit. Once those additional carrier costs are deducted, the effective loss ratio drops further still. State regulators have recognized the importance of loss ratios by imposing minimum floors: New York, for example, requires minimum loss ratios of 50 to 60 percent for hospital indemnity insurance and 60 to 70 percent for specified disease policies. N.Y. Comp. Codes R. & Regs. tit. 11, § 52.45. An arrangement that begins by diverting one-third of premiums to broker commissions makes compliance with even the lowest of these floors exceedingly difficult, and the shortfall represents value that participants lost because their premiums were being consumed by excessive broker commissions rather than returned as benefits.

45.     Aetna's voluntary benefits products under the Plan maintained an effective loss ratio well below 50 percent during the class period. The precise loss ratio will be established through discovery of Aetna's claims data. But the approximate magnitude of

KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

the shortfall is calculable from publicly available information: with 33.5 percent of premiums consumed by broker commissions, and carrier administrative expenses, taxes, and profit consuming an additional share, the portion of each premium dollar available to pay claims was severely constrained. Specifically, the Form 5500 Schedule A filings disclose premiums paid and commissions paid, allowing calculation of the commission load. 10-Ks from Aetna and comparable carriers establish industry norm loss ratios of approximately 50%. One may infer from this data that because: commissions consumed 33.5% of premiums, and industry carrier margins, including Aetna, + admin run approximately 15-20%, the residual available for claims is approximately 46-52% at best—meaning the effective loss ratio was compressed well below the regulatory floors cited.

46. For every dollar participants paid, the brokers received approximately 34 cents. This loss ratio was not the product of a high-risk, high-cost insurance program. It was the structural and inevitable consequence of an arrangement in which one-third of every premium dollar was diverted to broker commissions. The brokers were paid first. Participants got the remainder.

**C.      Participants Paid Excessive Premiums Due to Exorbitant Commissions**

47. Insurance carriers do not set voluntary benefits premium rates and then decide how to compensate brokers. Rather, the broker specifies the commission structure it requires as a condition of placing the business between an employer and a carrier. The carrier then builds that commission into its premium charge. The premium charge is the sum of: (a) the "pure premium"—the actuarially determined cost of paying expected

claims; (b) the carrier's administrative expenses; (c) the carrier's target profit margin; (d) premium taxes; and (e) the broker's commission. Each component is additive. A higher broker commission produces a higher premium rate, dollar for dollar. The inverse is also true—lower broker commissions mean lower premiums.

48.     The commission is not a markup applied to a separately disclosed base cost. The carrier establishes a single gross premium rate that embeds all cost components -- claims, expenses, taxes, profit, and broker compensation. The broker's commission percentage is applied to that all-in gross rate, which means the commission is calculated on top of, and grows proportionally with, the carrier's own costs and profit margin. This is basic arithmetic. If a carrier determines that the pure premium for a particular accident insurance product is $10 per month, and its administrative expenses, taxes, and profit margin add another $4, then the base cost of the product is $14. When the broker demands a 33.5 percent commission, the carrier must set the premium at approximately $21 per month (because the commission is calculated as a percentage of the premium, so $21 x 33.5% = $7.04, and $21 - $7.04 = $13.96, covering the carrier's base costs). If the broker demands zero commission—as is the case at comparably situated employer plans that have negotiated market-rate arrangements—the carrier can offer the same coverage for $14. The $7 difference is the cost of the broker's commission, and it comes directly from participants' paychecks.

49.     The broker's control over the commission structure is reinforced by the broker's control over carrier recommendations. Like other large brokers, Lockton maintains "carrier panels"—curated lists of insurance carriers with which Lockton has

19

pre-existing relationships and compensation agreements. When an employer such as Banner Health elects to provide voluntary benefits coverage, Lockton solicits bids from carriers on its panel. Lockton controls which carriers are invited to bid, which bids are presented to the employer, and how those bids are framed. Lockton's gatekeeping function means that the employer—and by extension, participants—never see the full market of available options. They see only the options Lockton has pre-screened to maximize its commissions.

50.     The commission structure also influences Lockton's incentives with respect to carrier retention and "churning." In the voluntary benefits industry, "heaped" commissions—where the broker receives a high first-year commission (often 60 to 75 percent of premiums) followed by lower renewal commissions (often 10 percent)—create a powerful incentive for brokers to switch carriers every few years to capture another large first-year payout. This practice, known as "churning," disrupts program continuity for participants and generates windfall profits for brokers at participants' expense. The spike in commissions paid by Plan participants in 2020—the commission rate jumped from 13.2 percent to 67.6 percent—resulted from a heaped commission structure that extracted the maximum possible first-year payout from participants' premiums.

51.     Plaintiff suffered direct financial harm from Banner Health's decision to cause the Plan to contract with Lockton, BCI, and Aetna. Plaintiff paid premiums from his wages. The premiums were calculated to cover the exorbitant broker commission. A lower commission would have produced a lower premium. A commission at or below the market rate of 10 percent—as comparable employer plans demonstrate is standard for

KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

identical products—would have produced a premium dramatically lower than what participants paid for the same level of insurance coverage.

52.     That Aetna paid the commissions to Lockton after receiving premiums paid by Plaintiff changes nothing. Plaintiff paid more than he should have because Lockton demanded and Aetna paid Lockton an exorbitant commission.

53.     Lockton has served as the Plan's primary broker for voluntary benefits since at least 2019. Lockton selected or recommended Aetna as the carrier for accident, critical illness, and hospital indemnity coverage, designed and structured the voluntary benefits offerings, and determined the commission structure that Aetna would build into its premium rates.

54.     Beginning in 2020, BCI became a co-broker, receiving commissions along with Lockton. For example, in 2024, BCI began receiving substantial commissions— approximately $2 million per year—from Plan assets beginning in 2020, the same year the overall commission rate on the Aetna voluntary benefits line spiked dramatically.

55.     Throughout the Class Period Lockton and BCI received commissions from Plan assets based on a percentage of premiums.

56.     The average commission rate over the six-year period was 33.5 percent of premiums—meaning that of every dollar employees paid in voluntary benefits premiums, approximately 34 cents was consumed by commissions that were built into the premium rate. In 2020, when BCI entered the arrangement, the commission rate spiked from 13.2 percent to 67.6 percent—a five-fold increase—consistent with a heaped commission structure in which the brokers extracted the maximum possible first-year payout from

participants' premiums. Third, even after the 2020 spike, the commission rate never fell below 25.5 percent in any subsequent year. Fourth, premiums more than tripled over the Class Period, increasing from $4.4 million to $15 million, yet commission rates remained elevated, demonstrating that the brokers' compensation scaled with premium volume rather than with the scope or complexity of services they or Aetna provided.

57.     The services Lockton and BCI provided did not justify compensation at these levels. Because voluntary benefits products are highly commoditized across carriers—with substantially similar coverage structures, benefit triggers, and policy terms—the broker's ongoing services consisted primarily of administrative coordination, not complex advisory work. The compensation vastly exceeded the value of the services. Lockton and BCI were paid as if they were building the program from scratch every year. They were not.

**D.      Substantially Similar Supplemental Insurance Products Were Available Throughout the Class Period at Lower Cost**

58.     Similarly-situated welfare plans and their participants pay much lower premiums for the same voluntary benefits insurance products—accident, critical illness, and hospital indemnity coverage—because such products are available with commissions averaging approximately 10 percent or less of premiums. As the Form 5500 comparators set forth below demonstrate, commission rates ranging from 2.1 percent to 10.7 percent prevail at comparable plans for identical product categories. The only material differences between these products and the supplemental health insurance provided by Aetna to the Plan are the premium charge, the loss ratio, and the brokerage commission.

KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

Lockton does not provide more or better services. Aetna does not provide more or better insurance coverage. Coverage structures, benefit triggers, and policy terms are substantially similar across carriers, the brokerage services required to place and administer these products are routine and do not justify compensation at the levels extracted from Banner Health's participants. A commission rate of 33.5 percent—more than three times the typical market rate—is unreasonable for products that require no complex advisory work, no ongoing investment monitoring, and no specialized actuarial analysis.

59.    The Dollar Tree Inc. Group Health Benefit Plan reported Lockton and Alliant Insurance Services, Inc. as its brokers for critical illness, accident, and hospital indemnity policies through Metropolitan Life Insurance Company in 2021 and 2022, and through Unum Insurance Company from 2023 to 2024. The plan covered between approximately 16,000 and 22,000 lives. The brokers collectively, including Lockton, collected less than 13.9 percent in commissions and fees in any single year, with an average across the Plans various Form 5500 filings of 10.7 percent.

60.    The Owens & Minor Flexible Benefits Plan reported in its 2024 Form 5500 filing that Lockton served as its broker for accident, critical illness, and hospital indemnity policies through Cigna Health and Life Insurance Company, covering over 4,500 lives. Lockton collected 9.4 percent of premiums paid in commissions from participants in that plan.

61.    The Circle K Stores Employee Benefit Plan reported in its 2024 Form 5500 filing that Mercer served as broker for its accident, critical illness, and hospital indemnity

KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

policies through the Guardian Life Insurance Company of America, covering over 60,000 lives. Mercer collected less than 6 percent in commissions and fees from participants in that plan.

62.     The PVH Corp. Welfare Benefits Plan reported in its 2024 Form 5500 filing that Mercer served as broker for its accident, critical illness, and hospital policies through Metropolitan Life Insurance Company, covering approximately 1,900 lives. The broker collected only 2.1 percent in commissions and fees from participants in that plan.

63.     The Kohl's Group Health Plan reported Mercer as its broker for critical illness, accident, and hospital indemnity coverage through UnitedHealthcare Insurance Company from 2019 through 2024, covering between approximately 4,800 and 12,800 lives. The broker collected less than 19 percent in commissions in any single year, with an average across the Plan's various Form 5500 filings of 10.1 percent.

64.     These comparators are not outliers. The commission rates at Banner Health—33.5 percent on average, peaking at 67.6 percent—are not merely above average. They are multiples of what comparable plans pay for identical products and identical services. The gap between what Banner Health's participants paid and what participants at comparably situated plans paid represents the measure of harm inflicted by Defendants' breaches. The market rate was 10 percent. Banner Health employees paid 33.5.

**E.      Banner Health Failed to Prudently Evaluate and Monitor Voluntary Benefits Costs**

65.      Had Banner Health conducted a diligent and competitive bidding process for voluntary benefits programs, it would have learned that it could obtain such coverage on behalf of the Plan and its participants at much lower cost for the same levels of coverage. That, over several years, Banner Health allowed the Plan and participants to pay exorbitant premiums to cover exorbitant broker commissions suggests Banner Health failed to act prudently and diligently in monitoring costs, including failing to conduct a competitive bidding process for the voluntary benefits insurance. The Plan's Form 5500 filings show no change in broker or carrier over the entire six-year period, and no publicly available records reflect any solicitation of alternative brokers or carriers.

66.      Publicly available market data—including Form 5500 filings from comparable employer plans—shows the premiums and commissions are unreasonable. Comparable large employer plans routinely maintained commission rates of 10 percent or below for substantially similar voluntary benefits products during the same period. Yet Banner Health paid 33.5 percent average commissions for Aetna products. No prudent fiduciary could have failed to discover this disparity through even minimal benchmarking, and no prudent fiduciary could observe it and take no action.

## CLASS ACTION ALLEGATIONS

67.      Plaintiff seeks certification of a class consisting of all participants in and beneficiaries of the Banner Health Master Health and Welfare Plan who paid premiums for voluntary benefits insurance issued by Aetna (including accident, critical illness, or

hospital indemnity coverage) at any time (the "Class") during the period from the date of the filing of the Complaint going back six years ("Class Period").

68.    The Class is so numerous that joinder of all members is impracticable. The Plan covers approximately 48,000 employees, and a substantial portion has participated in the voluntary benefits program at some point during the class period. The Class likely numbers in the thousands.

69.    Plaintiff is a member of the Class and has been injured as a result of Defendants' ERISA violations.

70.    There are questions of law and fact common to the Class that predominate over questions affecting individual members. Common questions include:

- whether Banner Health was a Plan fiduciary;

- whether Lockton was a party in interest;

- whether Lockton received Plan assets, directly or indirectly;

- whether Banner Health breached its fiduciary duties;

- whether Banner Health caused prohibited transactions;

- whether the commissions received by Lockton were unreasonable and excessive;

- the appropriate measure of losses; and

- the amount of excess compensation received by Lockton.

71.    Plaintiff's claims are typical of the Class. Plaintiff participated in the Plan, paid premiums for voluntary benefits, and suffered harm as a result of the excessive commission structure, just as all Class members did.

KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

26

KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

72.     Plaintiff will fairly and adequately represent the interests of the Class. Plaintiff has no conflicts of interest with other Class members. Plaintiff intends to prosecute this action vigorously and has retained experienced ERISA counsel.

73.     A class action is the superior method for fair and efficient adjudication of the claims. The claims involve uniform legal standards and common proof applicable to thousands of participants.

## CLAIMS FOR RELIEF

## COUNT I: BREACH OF FIDUCIARY DUTY

### (29 U.S.C. § 1104(a) — Against Banner Health)

74.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

75.     Banner Health is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Banner Health was the Plan administrator during the Class Period to the present.

76.     As detailed above, on information and belief, Banner Health failed to conduct any competitive bidding, benchmarking, or market testing of Lockton and BCI's compensation. Banner Health failed to evaluate whether the commissions were reasonable given the services provided. Banner Health failed to compare the Aetna commissions to readily available market benchmarks from comparable employer plans. Banner Health failed to monitor whether the commission rates remained reasonable as premiums more than tripled over the class period.

KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

77. As a result of these breaches, the Plan and its participants suffered losses of approximately $14.6 million—the difference between the $20.8 million in total commissions Lockton and BCI extracted from participant premiums and the approximately $6.2 million that would have been paid at a reasonable commission rate of 10 percent, consistent with market benchmarks for identical products.

78. As the Plan's sponsor and named fiduciary, Banner Health had a duty to monitor the performance and compensation of service providers.

79. Banner Health failed to perform the monitoring activities that a prudent fiduciary would have undertaken. Over the six-year class period, Banner Health never reviewed Lockton and BCI's commission rates for reasonableness, never compared them to market benchmarks, never solicited competing bids, never evaluated the relationship between the brokers' services and their compensation, and never assessed whether participants were receiving adequate value for their premium dollars.

80. Banner Health's failure to monitor persisted through identifiable triggering events that should have prompted review. In 2020, when the commission rate spiked from 13.2 percent to 67.6 percent, Banner Health took no action. In 2021, when Form 5500 filings disclosed the elevated commission payments, Banner Health took no action. Each year from 2020 through 2024, as premiums grew from $6.3 million to $15 million and commission payments grew correspondingly, Banner Health took no action. Each of these was a discrete failure to act—a separate breach of the continuing duty to monitor recognized in *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015).

81. As a result of Banner Health's failure to monitor, the excessive commission arrangement continued unabated for six years, and approximately $14.6 million in excessive commissions was extracted from participants' premiums. Had Banner Health conducted even minimal benchmarking at any point during those six years, the publicly available Form 5500 data would have revealed that Lockton accepted commissions of 10 percent or less at other plans for identical services. Banner Health is liable under ERISA § 409(a), 29 U.S.C. § 1109(a), for all losses resulting from its failure to monitor.

## COUNT II: PROHIBITED TRANSACTION

### (29 U.S.C. § 1106(a) — Against Banner Health)

82. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

83. Lockton is a party in interest to the Plan within the meaning of ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B). Lockton provided brokerage services to the Plan, as detailed above.

84. Banner Health caused the Plan to engage in prohibited transactions in violation of ERISA § 406(a)(1)(C) and (D), 29 U.S.C. § 1106(a)(1)(C) and (D), by causing Plan assets (participant premiums) to be paid to Lockton as parties in interest under an unreasonable compensation arrangement, and by causing Plan assets to be transferred to Lockton in the form of commissions for Lockton's benefit embedded in premium rates.

85.    The brokerage commissions paid to Lockton were not reasonable compensation, as demonstrated by the comparator data, the loss ratio analysis, and the absence of any market-testing by Banner Health.

86.    Each commission payment to Lockton from participant-paid premiums during the class period is a distinct prohibited transaction. The aggregate excessive compensation from these payments is approximately $14.6 million more than the 10 percent market benchmark.

## COUNT III: KNOWING PARTICIPATION IN ERISA VIOLATIONS

### (29 U.S.C. § 1132(a)(3) — Against Lockton and BCI )

87.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

88.    Under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), a court may award equitable relief against any person, including a non-fiduciary, who knowingly participates in a fiduciary's breach of duty and prohibited transactions.

89.    Lockton knowingly participated in Banner Health's violations. Lockton knew the commissions it received in connection with the Plan's supplemental health insurance program. Lockton knew it received far lower commissions in connection with similar supplemental health insurance programs provided by other plan sponsors. Lockton's own Form 5500 filings at other employer plans—including Dollar Tree (10.7 percent average commissions) and Owens & Minor (9.4 percent)—demonstrate that Lockton knew commission rates of 10 percent or below were available for substantially the same voluntary benefits products. Lockton therefore knew that its commission rates at

KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

Banner Health—peaking at 67.6 percent and averaging 33.5 percent—were far above market rate. As sophisticated brokers operating across hundreds of employer plans nationally, Lockton knew that the commission percentages they demanded were built into the premium rates participants paid, because that is the standard industry pricing mechanism they participated in daily.

90.    Lockton knew Banner Health was the Plan sponsor and Plan administrator and therefore knew Banner Health was a Plan fiduciary. Lockton knew Banner Health caused the Plan to contract with Aetna. Lockton knew Plan assets in the form of premiums were paid to Aetna. Lockton knew it would receive commissions from the premium payments. Lockton knew the amount of the premium payments included payment for Lockton's broker commissions. Lockton knew it was providing services to Banner Health and the Plan as a broker of insurance products.

91.    Lockton is liable for equitable relief under ERISA § 502(a)(3), including restitution, disgorgement, and the imposition of a constructive trust.

92.    BCI knowingly participated in Banner Health's violations. BCI knew the commissions it received in connection with the Plan's supplemental health insurance program. BCI knew the market for commissions was substantially lower than the commissions it received for the same kinds of services, from other voluntary benefit programs for substantially the same services. As sophisticated brokers operating across hundreds of employer plans nationally, BCI knew that the commission percentages they demanded were built into the premium rates participants paid, because that is the standard industry pricing mechanism they participated in daily.

KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

31

KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

93. BCI knew Banner Health was the Plan sponsor and Plan administrator and therefore knew Banner Health was a Plan fiduciary. BCI knew Banner Health caused the Plan to contract with Aetna. Lockton knew Plan assets in the form of premiums were paid to Aetna. BCI knew it would receive commissions from the premium payments. Lockton knew the amount of the premium payments included payment for Lockton's broker commissions. Lockton knew it was providing services to Banner Health and the Plan as a broker of insurance products.

94. BCI is liable for equitable relief under ERISA § 502(a)(3), including restitution, disgorgement, and the imposition of a constructive trust.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of the Plan and the Class, respectfully requests that this Court:

A. Find and declare that Banner Health breached its fiduciary duties under ERISA § 404(a), 29 U.S.C. § 1104(a), that Banner Health caused prohibited transactions under ERISA § 406, 29 U.S.C. § 1106, that Lockton is a party in interest to the Plan who knowingly participated in Banner Health's breaches of duties and prohibited transactions;

B. Find Banner Health liable under ERISA § 409(a), 29 U.S.C. § 1109(a), to make good on all losses to the Plan resulting from its violations, and to restore the Plan to the position it would have occupied but for the breaches of fiduciary duty and prohibited transactions;

C. Find Lockton liable under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), for knowing participation in Banner Health's ERISA violations;

KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

D.     Order disgorgement of all assets, profits, and commissions obtained by Lockton;

E.     Order the reversal of all non-exempt prohibited transactions;

F.     Determine the appropriate method for calculating the Plan's losses under ERISA § 409(a);

G.     Order Defendants to provide a full and complete accounting of all commissions, fees, and other compensation received from or in connection with the Plan;

H.     Remove breaching fiduciaries and enjoin Defendants from any future violations of ERISA's fiduciary and prohibited-transaction provisions;

I.     Surcharge Defendants, requiring restoration to the Plan of all improper, excessive, and unlawful amounts paid as broker commissions;

J.     Enjoin Banner Health to implement a competitive bidding process for broker services for the Plan's voluntary benefits program going forward, with bids reviewed every three to five years;

K.     Appoint an independent fiduciary to oversee the Plan's voluntary benefits program during a transition period to ensure that future arrangements comply with ERISA's fiduciary standards;

L.     Impose a constructive trust over all commissions and profits received by Lockton;

M.     Certify the Class as requested herein and appoint Plaintiff as class representative and his counsel as Class Counsel;

N.    Award attorneys' fees and costs under ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), and the common fund doctrine;

O.    Award pre-judgment and post-judgment interest to the extent permitted by law; and

P.    Grant such other and further equitable or remedial relief as this Court deems just and appropriate.

DATED this 28th day of April, 2026.

**KELLER ROHRBACK L.L.P.**

By */s/ Gary A. Gotto*
Gary A. Gotto, Bar No. 007401
Ron Kilgard, Bar No. 005902
Keller Rohrback L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone:  (602) 248-0088
Facsimile:  (602) 248-2822
ggotto@kellerrohrback.com
rkilgard@kellerrohrback.com

**BAILEY & GLASSER LLP**
Gregory Y. Porter (*pro hac vice* forthcoming)
1055 Thomas Jefferson Street, NW, Suite 540
Washington, DC 20007
Telephone:  (202) 463-2101
Facsimile:  (202) 463-2103
gporter@baileyglasser.com

*Attorneys for Plaintiff and the Proposed Class*

KELLER ROHRBACK L.L.P.
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: (602) 248-0088
Facsimile: (602) 248-2822

34